UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA

    - against –

OCH-ZIFF CAPITAL MANAGEMENT
GROUP LLC,

                Defendant.

------------------------------X

I N F O R M A T I O N

Cr. No. <u>16-516 (NGG)</u>
(T. 15, U.S.C., §§ 78m(b)(2)(A),
  78m(b)(2)(B), 78m(b)(5) and 78ff(a);
  T. 18, U.S.C., §§ 2, 371 and 3551 <u>et</u> <u>seq.</u>)

THE UNITED STATES ATTORNEY CHARGES:

      At all times relevant to this Information, unless otherwise stated:

I.    <u>The Foreign Corrupt Practices Act</u>

        1.    The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United

States Code, Sections 78dd-1, <u>et</u> <u>seq.</u> ("FCPA"), was enacted by Congress for the purpose of,

among other things, making it unlawful to act corruptly in furtherance of an offer, promise,

authorization, or payment of money or anything of value, directly or indirectly, to a foreign

official for the purpose of obtaining or retaining business for, or directing business to, any

person.

        2.    The FCPA's accounting provisions, among other things, required that any

issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78*l*, or required to file periodic reports

with the U.S. Securities and Exchange Commission ("SEC") under Section 15(d) of the

Exchange Act, 15 U.S.C. § 78o(d) (hereinafter "issuer"), make and keep books, records and

accounts that accurately and fairly reflect the transactions and disposition of the company's assets, and prohibited the knowing and willful falsification of an issuer's books, records, or accounts. 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) & 78ff(a).

3. The FCPA's accounting provisions also required that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences. The FCPA also prohibited the knowing and willful failure to implement such a system of internal accounting controls. 15 U.S.C. § 78m(b)(5) & 78ff(a).

II.    The Defendant and Relevant Entities and Individuals

4. The defendant OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC (the "defendant or "OCH-ZIFF") was a Delaware limited liability company and one of the largest alternative asset and hedge fund managers in the world. OCH-ZIFF had its headquarters in New York, New York and was listed on the New York Stock Exchange on November 14, 2007. Since that time, OCH-ZIFF has had a class of securities registered pursuant to Section 12 of the Exchange Act and has been required to file annual reports with the SEC under Section 15(d) of the Exchange Act, Title 15, United States Code, Section 78o(d). Accordingly, since November 14, 2007, OCH-ZIFF has been an "issuer" as that term is used in the FCPA, Title 15,

United States Code, Sections 78dd-1(a) and 78m(b). Prior to its initial public offering on November 14, 2007, OCH-ZIFF was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.     The Defendant OCH-ZIFF controlled numerous consolidated subsidiaries through which OCH-ZIFF operated and provided investment advisory and management services for individual hedge funds and alternative investment vehicles (the "Och-Ziff Hedge Funds") in return for management fees and incentive income. During the relevant time period, OCH-ZIFF had approximately $30 billion in assets under management and had offices located in New York, London and Hong Kong.

6.     OZ Management LP was a Delaware limited partnership and a subsidiary of the defendant OCH-ZIFF through which OCH-ZIFF registered as an investment adviser. Thus, OZ Management LP was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

7.     OZ Africa Management GP, LLC ("OZ Africa") was a Delaware limited liability company and a wholly-owned subsidiary of OZ Management LP. OZ Africa held the defendant OCH-ZIFF's interests for its joint-venture in Africa. OZ Africa was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.     Africa Management Limited ("AML") was a joint-venture company started by the defendant OCH-ZIFF, OZ Africa and affiliated and subsidiary entities with various South African business partners in 2007. AML established multiple investment funds under the

3

"African Global Capital" ("AGC") name which invested in companies with African mining and mineral assets and rights. The joint-venture partner and OCH-ZIFF owned 60 percent and 40 percent of the interest in AML, respectively. OCH-ZIFF's approval was required for all investments by AGC funds, and AML and AGC relied upon OCH-ZIFF's legal and compliance functions to perform due diligence, provide legal advice and document transactions.

9. "Och-Ziff Employee 1," a U.S. citizen whose identity is known to the United States and the defendant OCH-ZIFF, was a high-ranking officer of OCH-ZIFF. Och-Ziff Employee 1 was based in OCH-ZIFF's New York office. Och-Ziff Employee 1 was an officer of OZ Africa. Och-Ziff Employee 1 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "officer" and "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

10. "Och-Ziff Employee 2," a U.S. citizen whose identity is known to the United States and the defendant OCH-ZIFF, was a high-ranking officer of OCH-ZIFF. Och-Ziff Employee 2 was based in OCH-ZIFF's New York office. Och-Ziff Employee 2 was an officer of OZ Africa and executed various documents on its behalf. Och-Ziff Employee 2 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "officer" and "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

11. "Och-Ziff Employee 3," a U.S. citizen whose identity is known to the United States and the defendant OCH-ZIFF, was a senior executive of OCH-ZIFF and a member of OCH-ZIFF's partner management committee who headed OCH-ZIFF's London office. Och-Ziff Employee 3 was a "domestic concern" within the meaning of the FCPA, Title 15, United

4

States Code, Section 78dd-2(h)(1), and was an "employee" and "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

12.     "Och-Ziff Employee 4," a U.S. citizen whose identity is known to the United States and the defendant OCH-ZIFF, was a senior member of OCH-ZIFF's investor relations department. Och-Ziff Employee 4 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "employee" and "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.     "Och-Ziff Employee 5," an Australian citizen whose identity is known to the United States and the defendant OCH-ZIFF, was an employee of Och-Ziff Management Europe Limited, the London based subsidiary of OZ Management LP, and a member of OCH-ZIFF's European private investment team, which also had responsibility for investments in Africa. Och-Ziff Employee 5 was responsible for overseeing certain OCH-ZIFF investments involving mineral extraction, oil and other natural resources in Africa, and thus was an "employee" and "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

14.     "Och-Ziff Employee 6," a U.S. citizen whose identity is known to the United States and the defendant OCH-ZIFF, was a member of OCH-ZIFF's legal department and worked in multiple of OCH-ZIFF's offices. Och-Ziff Employee 6 was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2(h)(1), and was an "employee" and "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

15. "DRC Partner," an Israeli businessman whose identity is known to the United States and the defendant OCH-ZIFF, had significant interests in the diamond and mineral mining industries in the Democratic Republic of the Congo (the "DRC"). The defendant OCH-ZIFF, through OZ Africa, AGC and various subsidiary companies, and DRC Partner were investment partners for mining and mineral opportunities in the DRC. For these purposes, DRC Partner was an "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

16. "Libya Intermediary," an individual whose identity is known to the United States and the defendant OCH-ZIFF, was a London-based middleman with connections to foreign officials in Libya. Libya Intermediary was retained by OCH-ZIFF to act as an agent on behalf of OCH-ZIFF to obtain a $300 million investment from the Libyan Investment Authority ("LIA"), and thus was an "agent" of an issuer, OCH-ZIFF, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

III.    Foreign Government Entities and Officials

A.    Democratic Republic of the Congo

17. "DRC Official 1," an individual whose identity is known to the United States and the defendant OCH-ZIFF, was a senior official in the DRC who had the ability to take official action and exert official influence over mining matters in the DRC. DRC Official 1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

18. "DRC Official 2," an individual whose identity is known to the United States and the defendant OCH-ZIFF, was a senior official in the DRC and close advisor to DRC Official 1. Since at least 2004, DRC Official 2 was an Ambassador-at-Large for the DRC

6

government and also a national parliamentarian. DRC Official 2 had the ability to take official action and exert official influence over mining matters in the DRC, and was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

B.     Libya

19.     The LIA was formed in 2006 to serve as Libya's sovereign wealth fund to invest and manage the country's oil revenues on behalf of the Libyan government. The LIA was formed as part of the Libyan government's rapprochement with Western governments. The LIA was overseen by senior Libyan officials, was controlled by the Libyan government, and performed a government function on behalf of Libya. The LIA was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

20.     "Libyan Official 1," an individual whose identity is known to the United States and the defendant OCH-ZIFF, was a close relative of a high-ranking official in the Libyan government. Libyan Official 1 did not hold a formal position within the Libyan government, but possessed and used a Libyan diplomatic passport and conducted high profile foreign and domestic affairs on behalf of the Libyan government. Libyan Official 1 made administrative and investment decisions for the LIA, including through proxies like "Libyan Official 3," as described more fully below. Libyan Official 1 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

21.     "Libyan Official 2," an individual whose identity is known to the United States and the defendant OCH-ZIFF, was a high-ranking official in the Libyan government who could influence commercial matters in Libya. Libyan Official 2 could also influence the

7

granting of visas and landing permits for foreign visitors to Libya. Libyan Official 2 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

22.     "Libyan Official 3," an individual whose identity is known to the United States and the defendant OCH-ZIFF, was a high-ranking official at the LIA who could influence investment decisions. Libyan Official 3 was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

IV.     Overview of the Corruption Schemes

23.     In or about and between 2005 and 2015, DRC Partner, together with others, paid more than one-hundred million U.S. dollars in bribes to DRC officials to obtain special access to and preferential prices for opportunities in the government-controlled mining sector in the DRC. Beginning in December 2007, the defendant OCH-ZIFF, through Och-Ziff Employee 3 and Och-Ziff Employee 5, had discussions with DRC Partner about forming a joint venture between OCH-ZIFF and DRC Partner, through DRC Partner's companies, for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large publicly traded mining company. The underlying premise of the proposed joint venture was that DRC Partner had special access to attractive investment opportunities in the DRC through his relationships with officials at the highest levels of the DRC government. In return for access to these attractive investment opportunities, OCH-ZIFF would finance DRC Partner's operations in the DRC. Och-Ziff Employee 3 and Och-Ziff Employee 5 understood that OCH-ZIFF's funds would be used, in part, to pay substantial sums of money to DRC officials to secure access to these opportunities in the DRC mining sector. Although the parties did not enter into a written partnership agreement, as a result of agreeing to the corrupt arrangement, Och-Ziff Employee 3

and Och-Ziff Employee 5 secured long-term deal flow for OCH-ZIFF and AGC in the DRC mining sector.

24. In or about and between 2007 and 2010, the defendant OCH-ZIFF engaged Libya Intermediary as a third-party agent to assist in securing investments from the LIA into the Och-Ziff Hedge Funds. Libya Intermediary paid bribes to Libyan officials to corruptly influence those officials and thereby obtain investments from the LIA. OCH-ZIFF entered into a consulting agreement to pay Libya Intermediary a "finder's fee" of $3.75 million, while Och-Ziff Employee 3 knew that all or a portion of the fee would be paid to foreign officials in return for influencing the LIA to make a $300 million investment into the Och-Ziff Hedge Funds. As a result of the corrupt payments, OCH-ZIFF, through Och-Ziff Employee 3, secured the investment of LIA funds and approximately $100 million in pecuniary gain.

25. In addition, the defendant OCH-ZIFF and AGC made investments in companies doing business in the mining and mineral sectors of various developing countries, including countries with a documented high risk for corruption such as the DRC, Libya, Chad, and Niger. These investments by OCH-ZIFF, AGC and their business partners were facilitated through the use of illegal bribery. OCH-ZIFF knowingly failed to implement and maintain an adequate system of internal accounting controls designed to detect and prevent the misappropriation of assets by its employees, agents, and business partners. It further did not

appropriately respond to due diligence that was performed on proposed business transactions, agents, counterparties, and business partners or controls for payments to third parties.

V.     The DRC Corruption Scheme

     A.     Defendant OCH-ZIFF's Agreements with DRC Partner

     26.     In or about and between December 2007 and March 2008, the defendant OCH-ZIFF, through Och-Ziff Employee 3 and Och-Ziff Employee 5, began discussions with DRC Partner and others about forming a joint venture for the purpose of acquiring and consolidating valuable mining assets in the DRC into one large mining company.   At that time, DRC Partner communicated to Och-Ziff Employee 3 and Och-Ziff Employee 5 that DRC Partner would have to pay substantial sums of money to DRC officials, including DRC Official 1, and "local partners" to secure access to the attractive investment opportunities in the DRC mining sector.   DRC Partner communicated to Och-Ziff Employee 3 and Och-Ziff Employee 5 that, as part of the joint venture, DRC Partner expected OCH-ZIFF to help fund these corrupt payments, which would be above and beyond the acquisition and operational costs of the specific assets and transactions.   Neither Och-Ziff Employee 3 nor Och-Ziff Employee 5 shared this information with anyone within OCH-ZIFF's legal or compliance departments.

     27.     Och-Ziff Employee 3 started the internal process within the defendant OCH-ZIFF to enter into business with DRC Partner.   Consistent with OCH-ZIFF's anti-corruption policy as it related to prospective business partners, on or about February 14, 2008, Och-Ziff Employee 6 sent an e-mail to a due diligence firm requesting a background report on DRC Partner.   In that e-mail, Och-Ziff Employee 6 noted that information about DRC Partner "will be very easy to find . . . perhaps the impetus behind the movie 'Blood Diamonds.'"

28.     On or about February 21, 2008, Och-Ziff Employee 6 received an e-mail that attached the initial findings of the due diligence firm, which stated, among other things:

> [DRC Partner] has been willing to use his significant political influence with [DRC Official 1]. . . and his clique to facilitate acquisitions, settle disputes and frustrate competitors. . . .   [DRC Partner] was rumoured to have used his influence with [DRC Official 2], [DRC Official 1's] closest aide, and former Katanga governor in order to settle [a commercial] dispute in his favor. . . . Several compliance Watch Lists identify [DRC Partner] as a political [sic] exposed individual as a result of his close ties to the DRC government.  He is known to enjoy an extremely close relationship with [DRC Official 1]. . . .   He is happy to use his political influence against those with whom he is in dispute. . . . Whether through good PR and legal advice or indeed innocence, no allegations against him have yet been proved.   That said, he has been named in a UN report [and] keeps what can only be described as unsavory business associates.

29.     Based upon the report, and other publicly available information, various of the defendant OCH-ZIFF's senior employees had concerns about proceeding with any transaction with DRC Partner.   For example, Och-Ziff Employee 6 did not believe OCH-ZIFF should do business with DRC Partner and expressed to Och-Ziff Employee 3 strong concerns about doing business with DRC Partner.   Separately, Och-Ziff Employee 2 had come to believe that it was likely that DRC Partner was able to operate and acquire assets in the DRC because he paid bribes to officials.   In or about late February 2008, several members of OCH-ZIFF senior management advised Och-Ziff Employee 1 that although there was no strict legal or regulatory prohibition on doing business with DRC Partner, such as DRC Partner having being designated by the Office of Foreign Assets Control on a prohibited persons list, they recommended not undertaking transactions with him.   Thereafter, OCH-ZIFF proceeded to conduct several business transactions with DRC Partner in the DRC.

30.     Och-Ziff Employee 6 also forwarded the due diligence report on DRC Partner to an outside attorney representing the defendant OCH-ZIFF on anti-corruption issues. The outside attorney advised that providing a convertible loan to DRC Partner would be high-risk, but that there would be "no [anti-money laundering] or anti-corruption issue" as long as DRC Partner "has no discretion with regard to how to spend the proceeds of the loan." As described below, the subsequent agreements provided DRC Partner with a significant amount of discretion over the use of funds.

31.     In or about and between March 2008 and February 2011, the defendant OCH-ZIFF entered into several DRC-related transactions with DRC Partner: (1) an April 2008 purchase of approximately $150 million of shares in a publicly traded DRC-focused mining company controlled by DRC Partner ("Company A"); (2) a $124 million convertible loan through a subsidiary company and AGC to Company B, a DRC Partner-controlled shell entity, funded in or about and between April and October 2008 (the "Convertible Loan Agreement"); and (3) a $130 million margin loan to Company C, a DRC Partner-controlled shell entity, in November 2010 and February 2011 (the "Margin Loan Agreement"). Leading up to and through these transactions, Och-Ziff Employee 3 and Och-Ziff Employee 5 were made aware of and participated in the corrupt payments, using funds provided by OCH-ZIFF to Company B and Company C, that DRC Partner made to various DRC officials to secure mining interests in the DRC.

B.      The Bribery Scheme to Consolidate DRC Copper Mines

32.     The first aspect of the defendant OCH-ZIFF's partnership with DRC Partner involved OCH-ZIFF, OZ Africa or AGC structuring and funding simultaneous investments into two companies controlled by DRC Partner: Company A and Company B. On

or about March 7, 2008, Och-Ziff Employee 3 e-mailed a description of the first part of this plan to Och-Ziff Employee 1. In the e-mail, Och-Ziff Employee 3 stated that there would be three upcoming transactions requiring OCH-ZIFF funds. First, OCH-ZIFF would buy $150 million of new shares to be issued by Company A, controlled by DRC Partner, which Och-Ziff Employee 3 described as "the second biggest copper company in DRC." Second, DRC Partner would offer AGC 50 percent of a nearby copper and cobalt mine "at a very attractive price," and AGC would likely invest up to $200 million in it. Third, AGC and DRC Partner would buy 55 percent of a company called Africo Resources Limited ("Africo"), which owned a copper asset "next door" to DRC Partner's copper and cobalt mine. Och-Ziff Employee 3 wrote that the "[g]ame plan is to eventually merge [the copper and cobalt mine] and Africo into [Company A] for stock and control the company jointly with [DRC Partner]."

33. Africo was a Canadian mining company engaged in a dispute concerning its ownership interest in a DRC copper mine (the "DRC Mine"). The dispute involved a Congolese company called Akam Mining SPRL ("Akam"), which had obtained an *ex parte* default judgment against Africo following an employment dispute. In fact, DRC Official 2 had orchestrated the taking of Africo's interest in the DRC Mine and made it available to DRC Partner. Africo had engaged in legal proceedings in the DRC courts to try to nullify the seizure of its interest in the DRC Mine, which remained pending in March 2008.

34. On or about March 16, 2008, Och-Ziff Employee 3 received an e-mail from DRC Partner, which stated in part:

> As you can see, our only real point is this flexibility. The DRC landscape is in the making and I am shaping it - like no one else. I would love to have you beside me as a long-term partner. As 40% [Company A] shareholder, I facilitated your entry at an attractive time / price knowing that you see there is a bigger picture in all of

13

this. What this bigger picture exactly looks like, is yet to be determined, but it is your partner who is holding the pen - I just need flexibility on the drawing board to create full value for our partnership.

35.     Following DRC Partner's negotiations on behalf of the defendant OCH-ZIFF, on or about March 27, 2008, OCH-ZIFF entered into a supplemental subscription agreement with Company A, as contemplated in Och-Ziff Employee 3's e-mails above, to purchase a total of 150 million shares for a total of approximately $150 million. The stated purpose of the offering by Company A, to which OCH-ZIFF subscribed, was to raise capital to fund the company's ongoing mining efforts in the DRC. That same day, on or about March 27, 2008, DRC Partner caused $11 million to be delivered to DRC Official 2.

36.     The defendant OCH-ZIFF and DRC Partner agreed on a multi-step plan to obtain the disputed mining interest by acquiring Akam using OCH-ZIFF funds, and then settling the legal dispute over the DRC Mine. As part of its agreement, OCH-ZIFF, through AGC, provided Company B with significant financing to carry out the resolution of the DRC legal dispute and to gain control of Africo. This financing was provided through the Convertible Loan Agreement, which was originally intended to be approximately $115 million, funded in two tranches of $15 million and $100 million.

37.     On or about April 3, 2008, Och-Ziff Employee 5 sent an e-mail to Och-Ziff Employee 3 and others seeking approval to fund the first tranche under the Convertible Loan Agreement, in the amount of $15 million, to acquire Akam.

38.     On or about April 7, 2008, DRC Partner caused $2.2 million to be delivered to DRC Official 2, and on or about April 10, 2008, DRC Partner caused $2.8 million to be delivered to DRC Official 2.

14

39. On or about April 17, 2008, the defendant OCH-ZIFF, through AGC, funded the first tranche of the Convertible Loan Agreement through wire transfers from New York. This first tranche of $15.750 million was funded purportedly to acquire Akam, make a shareholder loan to Africo, and pay legal expenses. A few days later, on or about April 21, 2008, Africo announced that it reached an agreement with Company B for a private placement of CAD $100 million that would result in Company B (*i.e.*, DRC Partner's company) owning approximately 60 percent of Africo. This agreement required the approval of Africo's shareholders.

C.   Bribes Resolve Africo and Akam Dispute in DRC

40. DRC Partner caused bribes to be paid to DRC officials, including judges, to ensure that Africo did not obtain a favorable court ruling in its case against Akam that could have affected the outcome of the Africo shareholder vote.

41. On or about June 4, 2008, DRC Partner and one of his associates arranged to pay $500,000 to DRC officials, including judges, who were involved in the Africo court case to corruptly influence the outcome of those proceedings to the benefit of the defendant OCH-ZIFF and DRC Partner. The associate sent a text message to DRC Partner, which read:

> Hi [DRC Partner], im with the main lawyer. . . in the africo story, he has to arrange with supreme court, attorney genral [sic] and magistrates, he wants 500 to give to all the officials and 600 for 3 lawyers cabinets that worked on the file in defense[lawyer] and batonnier [lawyer]. the converstaion is vey tough.   (while talking i said to ask money to [one of the Akam shareholders], [the Akam shareholder] said he cant because most of the money has to go to [DRC Official 2]. . . i dont know if he wants to provoke me or it was something [the Akam shareholder] invented...) but they are now at 1,1 in total.

42.     On or about June 4, 2008, the associate sent another text message to DRC Partner, which stated: "he wants 500 for officials, 300 for them (3 lawyers office), 800 and in even in one month an extra 100 to make 900, he is very categoric[.]"   Approximately thirty minutes later, the associate sent a text message to DRC Partner, which stated: "with 800 they guarantee the results and they want me to promise that i will add 100 after."   Less than one minute later, DRC Partner responded to the associate's text message, writing: "We can't accept a mid result . . . Africo must be screwd and finished totally!!!!"

43.     On or about June 5, 2008, an associate of DRC Partner sent a text message to DRC Partner, which stated: "[lawyer] has met attorney general and the magistrat[e] that has to write the opinion, he also had contact with the 3 judges of supreme court. they got clear instructions to rewrite the opinion and to make sure that akam wins. they also agreed to do the lecture of the opinion on JUNE 13!"

44.     On or about June 12, 2008, Africo announced that its shareholders had voted to approve the private placement by DRC Partner through Company B.

45.     On or about June 18, 2008, DRC Partner caused $2.5 million to be delivered to DRC Official 2.

D.     Defendant OCH-ZIFF Learns of Allegations of Serious Misconduct Involving Company A and then Provides DRC Partner an Additional $109 Million

46.     On or about June 13, 2008, Och-Ziff Employee 3 and Och-Ziff Employee 5 learned of allegations that a significant portion of the money that had been invested in Company A through the April 2008 private placement may have been diverted from a mining investment to a political party in Zimbabwe.   Och-Ziff Employee 3 received a message which stated: "[Company A] paid 4 arms into zim, and rented boat from china.   Journo has bank

16

transfers apparently." Neither Och-Ziff Employee 3 nor Och-Ziff Employee 5 reported this matter to the defendant OCH-ZIFF's legal and compliance employees nor undertook efforts to determine whether the funds had been used as described in the message.

47.     On or about June 24, 2008, the defendant OCH-ZIFF, through AGC, funded the second tranche of the Convertible Loan Agreement totaling $98.275 million. The purpose of this tranche was to allow Company B to acquire the Africo shares and gain control over Africo. On or about July 10, 2008, Och-Ziff Employee 3 sent an e-mail to another Och-Ziff employee that read: "U have [Och-Ziff Employee 5's] mobile. [DRC Partner] just got a big asset for us."

48.     Later that month, on or about July 24, 2008, the defendant OCH-ZIFF, AGC, and DRC Partner amended the Convertible Loan Agreement to provide for a $9 million third tranche for "financing the working capital requirements. . . to the extent such requirements are in accordance with the Business Plan." Och-Ziff Employee 3 and Och-Ziff Employee 5 knew that the operating expenses for Company B's business plan included paying bribes to high-level DRC officials.

49.     On or about October 9, 2008, the defendant OCH-ZIFF funded its share of the third tranche of the Convertible Loan Agreement totaling $4.5 million, while the joint-venture partner in AGC contributed the remaining $4.5 million.

E.    Defendant OCH-ZIFF'S Audit Uncovers Bribery in DRC Partner's Operations

50.    In or about November 2008, AGC employees who were based in South Africa and reported to Och-Ziff Employee 5 conducted an audit of Company B's expenses to ensure that the third tranche of the Convertible Loan Agreement was properly spent.    These AGC employees were given limited access to DRC Partner's business records.    Their draft audit report, which was sent to Och-Ziff Employee 5 and another Och-Ziff employee, included the following paragraph:

> Satisfactory answers could not be extracted during my discussions (with [DRC Partner's employees]) for some of these expenses and it leads one to believe that these are actually the costs of maintaining "political alignment" and for "protocol" with the authorities in the DRC – in other words with senior Government officials.  **This issue needs to be investigated at the highest level directly with [DRC Partner's company].   This issue should be flagged as a concern considering AGC's compliance requirements.**
> (emphasis in original)

51.    After reviewing the draft audit report, Och-Ziff Employee 5 spoke with one of the employees who drafted it and instructed that the above-described paragraph referencing payments for "political alignment" with senior government officials be removed from the report.    The employee did as instructed by Och-Ziff Employee 5, and on or about December 9, 2008, the employee sent an e-mail to Och-Ziff Employee 5, which stated, in part: "[Och-Ziff Employee 5,] As discussed please find attached the revised report[.]"    The attached revised report did not contain the paragraph that referenced payments to senior government officials.

18

F.   Defendant OCH-ZIFF and DRC Partner Find a Buyer for DRC Assets

52.   The defendant OCH-ZIFF and AGC did not exercise the option to convert into equity in Company B, did not require payment on the loan when it was due to be repaid in full on or about April 24, 2009, and did not seek to exercise its rights on the collateral of the loan.   Instead, the repayment dates for the Convertible Loan Agreement were continually extended until a publicly traded mining company ("Mining Company 1") purchased Company B.

53.   To attract a buyer for Company B, Och-Ziff Employee 5 worked with DRC Partner to obtain additional assets to inject into or sell alongside Company B, including assets known as Kolwezi Tailings and SMKK.   The defendant OCH-ZIFF knew that Kolwezi Tailings had been stripped by the DRC government from a mining company immediately before being obtained by a group of companies controlled by DRC Partner and the DRC government. OCH-ZIFF also knew that the SMKK asset was the subject of a back-to-back sale that allowed DRC Partner to purchase the asset for $15 million from the DRC-owned and controlled mining company, La Générale des Carrières et des Mines ("Gécamines"), and immediately resell it to Mining Company 1 for $75 million even though Mining Company 1 had the right of first refusal to buy that same interest directly from Gécamines.

54.   Throughout the period of DRC Partner's acquisition of Kolwezi Tailings and SMKK, DRC Partner continued to make corrupt payments to DRC Official 2.   For example, on or about December 23, 2009, DRC Partner delivered $1 million to DRC Official 2; on or about January 5, 2010, DRC Partner delivered $2 million to DRC Official 2.

55. On or about August 20, 2010, Mining Company 1 acquired 50.5 percent of Company B. Mining Company 1 agreed to pay up to $575 million over two years, including $50 million in cash. Och-Ziff Employee 3 and Och-Ziff Employee 5 were informed by a co-conspirator that the $50 million was for DRC Partner to "use on the ground" to corruptly acquire Kolwezi Tailings. As part of the deal, Mining Company 1 guaranteed repayment of the Convertible Loan Agreement through a novation of the loan.

56. Following the novation of the Convertible Loan Agreement, the defendant OCH-ZIFF continued to provide DRC Partner with financing in exchange for deal flow of investment opportunities in the DRC, per their original agreement.

G. Defendant OCH-ZIFF Provides DRC Partner an Additional $130 Million

57. On or about November 11, 2010, Och-Ziff Employee 3 sent an e-mail to another Och-Ziff employee, which stated: "[DRC Partner] has asked for a margin loan on katanga shares which want u to handle."

58. On or about November 16, 2010, an Och-Ziff employee sent a draft term sheet for the loan to Och-Ziff Employee 3, who then forwarded it on to DRC Partner. The parties then negotiated the terms of the loan. DRC Partner's representatives stressed that they would need to make intercompany loans with the proceeds of the loan and that any "use of proceeds" provision in the loan document would have to be generic.

59. On or about November 18, 2010, the defendant OCH-ZIFF incorporated a new Cayman Islands based partnership called CML Investments Ltd. ("CML"). CML was controlled by OCH-ZIFF.

60. On or about November 24, 2010, the defendant OCH-ZIFF, in two separate transfers through CML, extended a $110 million margin loan to Lora Enterprises

Limited ("Lora"), a DRC-Partner-controlled company. The use of proceeds provision allowed for "(ii) funding existing activities of Affiliates of the Borrower and acquisitions of other business interests by its Affiliates; and (iii) other general purposes of the Borrower's Affiliates."

61.    On or about February 17, 2011, CML and Lora agreed to an amended and restated margin loan agreement which increased the amount of funding available to Lora by an additional $20 million.

62.    In or about and between November 2010 and February 2011, DRC Partner caused approximately $20 million in corrupt payments to be made to various DRC officials, including the following payments made on or about the following dates:

| Date | Amount in USD | Bribe Recipient |
|---|---|---|
| December 1, 2010 | $1 million | DRC Official 1 |
| December 3, 2010 | $2 million | DRC Official 1 |
| December 7, 2010 | $2 million | DRC Official 1 |
| December 9, 2010 | $2 million | DRC Official 1 |
| December 15, 2010 | $350,000 | DRC Official 2 |
| December 17, 2010 | $250,000 | DRC Official 2 |
| January 13, 2011 | $500,000 | DRC Official 2 |
| February 9, 2011 | $3 million | DRC Official 1 |
| February 9, 2011 | $1 million | DRC Official 2 |
| February 23, 2011 | $750,000 | DRC Official 1 |

63.    On or about February 12, 2012, DRC Official 2 died. On or about February 13, 2012, Och-Ziff Employee 5 sent an e-mail message to Och-Ziff Employee 3, which

stated: "FYI, [DRC Official 2 is] dead, [DRC Partner's] key guy in DRC." Och-Ziff Employee 5's e-mail included the text of a Financial Times article on the official's death, which stated, among other things: "[DRC Official 2], member of parliament and a former governor of Congo's copper heartlands province, Katanga, cut a shadowy figure. Diplomats associate him with Congo's entrenched corruption and a series of secret investments. Congo is one of the world's poorest countries despite its mineral wealth, and ranks among the worst places to do business."

64. On or about February 15, 2012, DRC Partner sent a text message to Och-Ziff Employee 5, which stated, "I'm fine. . . sad but fine. . . I will have to help [DRC Official 1] much more now. . . tomorrow the burial will take place."

65. In or about and between August 2012 and January 2013, the defendant OCH-ZIFF received wire transfers of $342,091,110 from DRC Partner-controlled companies as satisfaction of the outstanding agreements, representing a profit of approximately $91,181,182.

VI. The Libya Corruption Scheme

A. Defendant OCH-ZIFF Engages Libya Intermediary to Obtain Investments in Libya

66. Beginning in or around 2007, the defendant OCH-ZIFF sought to secure investments from the LIA into the Och-Ziff Hedge Funds. In connection with these efforts, in or about 2007, Och-Ziff Employee 3 arranged to have Libya Intermediary act on OCH-ZIFF's behalf to obtain an investment from the LIA. At the time OCH-ZIFF engaged Libya Intermediary, Och-Ziff Employee 3 knew that Libya Intermediary would need to make corrupt payments to Libyan officials to secure that investment. Libya Intermediary did in fact make corrupt payments to and for the benefit of Libyan Official 1, Libyan Official 2, and Libyan Official 3.

22

67.     In addition, during the time Libya Intermediary was working as the defendant OCH-ZIFF's agent to secure an investment from the LIA, Och-Ziff Employee 3 caused OCH-ZIFF funds to invest $40 million in a Libyan real estate development project (the "Libya Real Estate Development Project"), which was founded and overseen by Libya Intermediary. Och-Ziff Employee 3 described his motivation to make this $40 million investment as, in part, "a bet on Libya here and relationship. need to get done quickly," a reference to the relationship with Libya Intermediary. In connection with this investment, OCH-ZIFF paid a $400,000 "deal fee" to an entity controlled by Libya Intermediary, which Och-Ziff Employee 3 understood was to compensate Libya Intermediary for bribes that Libya Intermediary had to pay to Libyan officials in connection with the Libya Real Estate Development Project.

68.     In or about February 2007 onward, Libya Intermediary worked as the defendant OCH-ZIFF's agent to obtain an asset placement from the LIA. Prior to engaging Libya Intermediary to work on the defendant OCH-ZIFF's behalf, OCH-ZIFF did not conduct any due diligence on Libya Intermediary, and there was no formal approval of Libya Intermediary to work on behalf of OCH-ZIFF.

69.     In or about and between February 2007 and March 2007, Libya Intermediary explained to Och-Ziff Employee 3 that the LIA was largely controlled by Libyan Official 1 through Libyan Official 3. Libya Intermediary arranged for Och-Ziff Employee 3 to meet with Libyan Official 1 and Libyan Official 3 in Vienna, Austria.

70.     On or about March 7, 2007, Och-Ziff Employee 3 traveled from London, England to Vienna, Austria to attend the meeting, which took place in a hotel suite, with Libya Intermediary, Libyan Official 1, Libyan Official 3 and an associate of Libya Intermediary. At

the meeting, Och-Ziff Employee 3 and Libyan Official 1 discussed the defendant OCH-ZIFF's business and the LIA generally and the possibility of the LIA making an investment in the Och-Ziff Hedge Funds.

71.     Although Och-Ziff Employee 3 did not inform the legal or compliance functions at the defendant OCH-ZIFF about the meeting with Libyan officials, he informed Och-Ziff Employee 1 of the meeting. Shortly after the meeting, Och-Ziff Employee 3 sent an e-mail to Och-Ziff Employee 1, stating, "Meetings are amazing. They have 77 billion, half in cash and no idea who to give it to." Later that same day, Och-Ziff Employee 3 sent an e-mail to Och-Ziff Employee 1, stating, "I haven't been this excited in a while."

72.     On or about March 8, 2007, Och-Ziff Employee 3 sent an e-mail to Libyan Official 3, which stated, in part: "It was very nice meeting you yesterday. I think there are many ways we can work together on the investment side. I have attached an overview of our main fund. I would love to get you in as an investor in one of our funds so we can start a dialogue and look at investments together."

73.     On or about May 29, 2007, Och-Ziff Employee 1 sent an e-mail to Och-Ziff Employee 3 inquiring about the status of the potential investment from the LIA. Och-Ziff Employee 3 sent a response, stating, "I thought you were against it so I havent [sic] pursued it. The agent wants to come in and see me this week. You OK with that?" Och-Ziff Employee 1 responded, "I will be ok. Will call you."

74.     On or about August 9, 2007, Och-Ziff Employee 1 sent an e-mail to Och-Ziff Employee 3, asking: "Is Libya in for Sept 1?" Och-Ziff Employee 3 responded, "I think so. Will check."

75.     On or about September 11, 2007, an employee of a due diligence firm transmitted a report on Libya Intermediary and his business partner to the defendant OCH-ZIFF's employees via an e-mail, which stated in part: "These guys [Libya Intermediary and his business partner] were hard to pin down because they have always acted as advisors and kept their money and interests offshore." The background report added that: "[Libya Intermediary's company] uses special purpose vehicles based offshore that have no subsidiaries, no employees and no operations other than relating to the transaction for which they were established. This, and their activities as 'fixers', means that there is little documented evidence of the company's activities either in the UK or internationally."

76.     On or about and between September 19, 2007 and September 20, 2007, Och-Ziff Employee 3, Och-Ziff Employee 4, and another Och-Ziff employee traveled to Tripoli, Libya, where they were met by Libya Intermediary. Libya Intermediary arranged for the landing permits and visas for this trip through Libyan Official 2.

77.     On or about September 20, 2007, Och-Ziff Employee 3 and Och-Ziff Employee 4 met with the LIA at the LIA's office. Indeed, Libya Intermediary did not accompany them to this meeting despite purportedly serving as the defendant OCH-ZIFF's introductory agent. To the contrary, Libya Intermediary communicated to Och-Ziff Employee 3 that Libya Intermediary's role as OCH-ZIFF's agent could not be publicly disclosed to the LIA. Prior to the meeting, Och-Ziff Employee 3 did not disclose to Och-Ziff Employee 4 that Libya Intermediary was acting as OCH-ZIFF's agent for the potential LIA investment. Och-Ziff Employee 3 also did not inform Och-Ziff Employee 4 that he (Och-Ziff Employee 3) previously had met with Libyan Official 1 and Libyan Official 3 in Vienna, Austria to solicit an investment from the LIA. There was no mention of Libya Intermediary during the meeting.

25

B.      <u>Libya Intermediary's "Consultancy Agreement" and the LIA's Investment</u> <u>of $300 Million into the Och-Ziff Hedge Funds</u>

78.      Throughout in or about 2007, over the course of multiple conversations, Och-Ziff Employee 3 and Libya Intermediary negotiated the amount of the fee the defendant OCH-ZIFF would pay to Libya Intermediary in the event OCH-ZIFF received an investment from the LIA. During these discussions, Libya Intermediary repeatedly told Och-Ziff Employee 3 that Libya Intermediary would have to confer with an undisclosed third-party to confirm whether or not the proposed size of the fee was acceptable. Och-Ziff Employee 3 told Libya Intermediary that OCH-ZIFF was limited in how much it could pay because it was a regulated entity in the United States. Och-Ziff Employee 3, Libya Intermediary and the undisclosed third-party ultimately agreed on a fee of $3,750,000 to be paid in two installments for the LIA's $300 million investment into the Och-Ziff Hedge Funds.

79.      On or about November 26, 2007, which was four days before the LIA funded its $300 million investment, Och-Ziff Employee 3 spoke with Och-Ziff Employee 1 about paying Libya Intermediary a fee in connection with the LIA investment.

80.      The next day, on or about November 27, 2007, Och-Ziff Employee 1 forwarded an e-mail from an Och-Ziff officer to Och-Ziff Employee 3. The e-mail contained conditions that had to be met for the fee to be paid:

> . . . There has to be a written agreement between OZ and the person who receives payment that. . . requires the solicitor, at the time of any solicitation, to provide the client with a copy of the [investment adviser registration] and a separate written disclosure document containing information relating to the solicitation arrangemen [sic] (including the comp to be paid); and the adviser receives from the client an executed acknowledgment showing that the client received the separate written disclosure document[.]

81. After receiving the legal advice forwarded by Och-Ziff Employee 1 on or about November 27, 2007, Och-Ziff Employee 3 contacted Libya Intermediary and informed Libya Intermediary that, contrary to their previous discussions, the defendant OCH-ZIFF might be required to disclose Libya Intermediary's role as an OCH-ZIFF agent to the LIA. Libya Intermediary and Och-Ziff Employee 3 discussed ways to satisfy OCH-ZIFF's requirements without actually providing such disclosure to the LIA. To this end, Och-Ziff Employee 3 and Libya Intermediary discussed the possibility of OCH-ZIFF delivering the disclosure to the LIA through Libya Intermediary, which Libya Intermediary would fail to deliver. Och-Ziff Employee 3 and Libya Intermediary also discussed the possibility of Libya Intermediary providing a false representation to OCH-ZIFF that Libya Intermediary had provided the LIA with disclosure of Libya Intermediary's role.

82. On or about November 30, 2007, the defendant OCH-ZIFF received the signed subscription documents and wire transfers from the LIA for a total investment of $300 million into two of the Och-Ziff Hedge Funds.

83. A few days later, on or about December 4, 2007, an officer of the defendant OCH-ZIFF sent an e-mail to Och-Ziff Employee 3, which attached a consultancy agreement (the "Consultancy Agreement") and an anti-corruption side letter (the "Side Letter") between OZ Management LP and a special purpose vehicle based in the British Virgin Islands ("BVI SPV-1"), which Libya Intermediary established for the sole of purpose of receiving the LIA-related fee from OCH-ZIFF. Och-Ziff Employee 3 replied to the e-mail stating: "looks good." The Consultancy Agreement described BVI SPV-1 as follows: "[BVI SPV-1] has technical and commercial expertise in Libya as a consultant to companies (in particular in information gathering, strategic analysis, high-level introduction, negotiations and promotion of

27

projects and implementation)." This description was false insofar as BVI SPV-1 had no employees, had no expertise and had never acted as a consultant in Libya or elsewhere to any company.

84. The Consultancy Agreement stated that: "[BVI SPV-1] has offered to provide assistance to [OZ Management LP] with respect to introducing the Company to the [LIA], developing and coordinating strategy and tactics to promote and encourage LIA to invest in [OZ Management LP] by cash injection into the account of [OZ Management LP] or any of its funds[.]" Under the terms of the Consultancy Agreement, BVI SPV-1 undertook to "assist OZ Management LP in connection with the introduction of the [OZ Management LP] to and promoting its interests and reputation with LIA." The forward-looking agreement did not reflect that Libya Intermediary had been working for the defendant OCH-ZIFF, at the direction of Och-Ziff Employee 3, since February 2007. The fee for the purported services was $3.75 million, payable in two installments.

85. The Side Letter, which included anti-corruption representations from the BVI SPV-1, stated: "[t]he Investor has been informed in writing of the [Consultancy] Agreement and the consideration payable to ourselves thereunder." This representation was false; the LIA was not notified in writing or otherwise that the defendant OCH-ZIFF agreed to pay fees to BVI SPV-1 in connection with the LIA's investment into the Och-Ziff Hedge Funds. OCH-ZIFF did not obtain a copy of any written notification, nor did OCH-ZIFF attempt to notify the LIA directly of its relationship with Libya Intermediary or BVI SPV-1, nor did OCH-ZIFF obtain an acknowledgement from the LIA that it had been notified of Libya Intermediary's agreement or payments.

86. The Consultancy Agreement and the Side Letter were executed between OZ Management LP and BVI SPV-1 on or about January 15, 2008, but backdated to appear as if they were executed on or about December 5, 2007. Contrary to the defendant OCH-ZIFF's internal policies requiring the company to conduct sufficient due diligence on proposed business transactions and partners to be confident in the legitimacy of proposed transactions, OCH-ZIFF did not conduct any due diligence on BVI SPV-1 before entering into the Consultancy Agreement.

C.   Bribe Payments to Various Libyan Officials

87. On or about January 16, 2008, the defendant OCH-ZIFF paid BVI SPV-1 $2.25 million in connection with Libya Intermediary's work on behalf of OCH-ZIFF to obtain the $300 million investment from the LIA. That same day, on or about January 16, 2008, Och-Ziff Employee 3 described Libya Intermediary in an e-mail to a business associate as follows: "[Libya Intermediary] is very close to [Libyan Official 1], LIA and other government officials. . . . Alot [sic] of people in Libya say they can get things done, but [Libya Intermediary] actually does so I dont [sic] think it will be a waste of your time."

88. On or about January 29, 2008, Libya Intermediary, through BVI SPV-1, transferred two-thirds of the interest in BVI-SPV-1 to an associate of Libya Official 1. On or about January 31, 2008, BVI SPV-1 sent a wire transfer totaling $1,507,659.61 through an intermediary account which was subsequently paid onward to an account in Switzerland held by a proxy for the benefit of Libyan Official 1.

89. On March 5, 2008, BVI SPV-1 transferred $331,478.00 from its account at Investec Bank in Guernsey to an account for a British Virgin Islands company that was controlled by Libya Intermediary ("BVI SPV-2"). The next day, on or about March 6, 2008,

Libya Intermediary transferred €500,045 from an account at Standard Chartered in Jersey to a Bank of Valetta account in Malta in the name of Libya Official 2's son, over which Libya Official 2 had signatory authority. Also on or about March 6, 2008, Libya Intermediary transferred $400,000 from BVI SPV-2's US Dollar account at Blom Banque France, London Branch to a Bank of Valetta account in Malta in the name of Libya Official 2's son, over which Libya Official 2 had signatory authority.

90. In addition, Libya Intermediary regularly provided Libyan Official 3 with in-kind payments to gain and maintain influence with Libyan Official 3. These in-kind payments included, but were not limited to, payments for luxury travel, hotel accommodations and jewelry. Libya Intermediary also paid the living expenses of Libyan Official 3's brother while he resided in London.

91. The second tranche of the "consultancy fee" owed by OZ Management LP to BVI SPV-1 in connection with the original $300 million LIA investment was due to be paid on or about December 1, 2008. On or about October 30, 2008, Libya Intermediary spoke with Och-Ziff Employee 3 and asked to be paid early, and Och-Ziff Employee 3 agreed to do so. Och-Ziff Employee 3 directed Och-Ziff personnel to pay Libya Intermediary's invoice. On or about November 5, 2008, at the direction of Libya Intermediary, BVI SPV-1 transferred $1,005,000.00 from its account to an intermediary account, which was subsequently paid onward to an account in Switzerland held by a proxy for the benefit of Libyan Official 1.

92.     The defendant OCH-ZIFF accrued fees and incentive income from the LIA fund investment totaling approximately $100,181,881.

VII.     Defendant OCH-ZIFF's Policy, Procedure and Control Violations

93.     At all times relevant, the defendant OCH-ZIFF sought business opportunities in countries with high corruption risks, including, among other places, the DRC, Libya, Chad, and Niger.   Despite understanding the nature of the corruption risks presented by doing business in those countries, OCH-ZIFF knowingly failed to implement an adequate system of internal accounting controls and failed to enforce the internal accounting controls it did have in place, which failed to prevent bribe payments from being made in DRC, Libya, Chad, and Niger.   Further, in instances where the potential improper use of proceeds was identified, OCH-ZIFF did not take corrective measures, obtain verification of payments or seek to exercise contractually available audit or cancellation rights.

94.     The defendant OCH-ZIFF also knowingly failed to implement and maintain adequate controls for the approval of business transactions and consultancy agreements. With respect to Libya Intermediary, although OCH-ZIFF had prior dealings with Libya Intermediary relating to obtaining a Kazakhstan oil field investment, it did not conduct due diligence on, and only obtained anti-corruption representations from, BVI SPV-1, a shell company that did not actually provide or support any of the services rendered.   OCH-ZIFF further permitted Och-Ziff Employee 3 to enter into arrangements for deal fees and payments without requiring contracts, proof of services or legal pre-approval, including for an earlier $400,000 deal fee to Libya Intermediary in connection with the Libya Real Estate Development Project where no agreement was in place and Och-Ziff Employee 3 knew that the fee would be used for bribe payments.   OCH-ZIFF approved the payment of the deal fee without conducting

31

adequate due diligence on the offshore entity which received the funds and without restricting the funds' use.

95.     The defendant OCH-ZIFF did not implement controls to ensure the effective enforcement of policies governing interactions by third-parties with prospective clients, including requirements (a) that such arrangements were to be pre-cleared by legal or compliance and (b) that OCH-ZIFF provide prospective clients with a written disclosure of any agreements for a third-party to secure money from the prospective client on behalf of OCH-ZIFF.

96.     The defendant OCH-ZIFF also knowingly failed to implement and maintain controls to address known risks for corruption or misuse of company funds in connection with contractual agreements or investments.   OCH-ZIFF proceeded to conduct multiple business transactions with DRC Partner and entities associated with him despite objections from senior compliance and control personnel.   When Och-Ziff Employee 3 and Och-Ziff Employee 5 learned of possible misuse of funds in connection with the Company A investment, OCH-ZIFF conducted no review or audit to confirm or rebut the allegations, and thereafter advanced more than $200 million to DRC Partner for additional transactions.   Further, OCH-ZIFF continued to engage with business partners after those partners had presented deals where corrupt payments were expressly required.   For example, a deal presented by OCH-ZIFF's partner in AGC to Och-Ziff Employee 3 included "$5 million for the ongoing Presidential campaign" in a West African country.   Although Och-Ziff Employee 3 shared this proposal with two analysts, it was not shared with legal or compliance.

97.     In connection with funding AGC's first fund, the defendant OCH-ZIFF did not establish adequate controls over the use of proceeds provided by OCH-ZIFF to its future joint-venture partner.   Prior to the formation of the first AGC-branded investment fund, African

32

Global Capital, LP ("AGC I"), OCH-ZIFF funded requests for loans that were convertible into equity in AGC I to its business partners on short notice and without completing adequate due diligence on the use of the proceeds. On or about June 1, 2007, an OCH-ZIFF analyst responsible for assessing the projects e-mailed Och-Ziff Employee 3: "I've asked for budgets etc for all these projects but nothing yet," and followed up by writing, "[w]e've seen the basic structure for these and did 'just' enough to put the loan together last time . . . as they needed it asap." On or about October 2, 2007, the same analyst e-mailed Och-Ziff Employee 3: "Been trying to get exact detail etc on where money is going but detail isn't great. Don't think we can get huge amounts more detail now (been trying for a while) but we need to find a systematic way of approving expenditure in the future." Despite repeatedly failing to conduct sufficient due diligence, OCH-ZIFF continued to fully fund the requests of its joint-venture partners and never developed a systematic way to track the funds provided to the joint venture through 2012.

98. In or about and between May 2007 and February 2009, an AGC portfolio company used funds provided by the defendant OCH-ZIFF to pay various consultants employed by the joint-venture portfolio company, including a Gabonese national ("Gabonese Consultant"). Beginning in October 2007, OCH-ZIFF became aware that the salary payments to Gabonese Consultant in connection with operations in Chad and Niger, were a "deal introduction related consulting fee," and that Gabonese Consultant's "consulting fee" was nearly two and one-half times the salary of the remaining 19 portfolio-company employees combined. OCH-ZIFF further identified other unknown consultant payments and that the funds provided by OCH-ZIFF to the joint-venture partners were being used for, among other purposes, personal expenditures and personal travel of the joint-venture partners. In or about and between January 2008 and July 2008, despite identifying that the joint-venture payments were not being adequately justified,

33

including the payments to Gabonese Consultant, OCH-ZIFF funded approximately $20,141,734 in capital calls for the joint venture. Ultimately, portions of these capital calls funded by OCH-ZIFF were used to reimburse bribe payments that Gabonese Consultant had made in Chad and Niger.

99. On or about October 3, 2008, Och-Ziff Employee 3 received an e-mail containing the results of an audit of the joint-venture portfolio company which indicated, among other things: "Results of audit are very weak with poor controls and management . . . . [Subsidiary companies and management] needs [sic] significantly more supervision." The defendant OCH-ZIFF did not thereafter sufficiently address the deficiencies identified in the audit. Further, senior employees of OCH-ZIFF, including Och-Ziff Employee 3, did not adequately enforce various applicable internal policies, including the AGC Anti-Corruption and Anti-Money Laundering Policy and Suggested Procedures which OCH-ZIFF had specifically designed to be implemented at the joint venture. When Gabonese Consultant later refused to sign anti-corruption warranties, OCH-ZIFF continued to do business with him as an intermediary in 2011.

100. In or about and between mid-2007 and February 2009, Gabonese Consultant provided at least $2 million in bribe payments to officials in Niger and the Republic of Chad in connection with obtaining uranium concessions for the joint venture. The defendant OCH-ZIFF and the joint venture continued to hold and renew licenses for the uranium concessions through 2012. During the relevant period, OCH-ZIFF accrued approximately $30 million in fees in connection with investments for which it failed to implement or enforce effective controls.

## COUNT ONE
(Conspiracy to Bribe DRC Officials)

101.   The allegations contained in paragraphs one through 100 are realleged and incorporated as though fully set forth in this paragraph.

102.   On or about and between December 1, 2007 and February 12, 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit:

a.   as an issuer, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a foreign political party official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official and a foreign political party official, for purposes of: (i) influencing acts and decisions of such foreign official and foreign political party official in his or her official capacity; (ii) inducing such foreign official and foreign political party official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official and foreign political party official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist OCH-ZIFF in obtaining and retaining business for and with, and directing business to itself, DRC Partner, certain companies

35

controlled by or affiliated with DRC Partner, the Och-Ziff Hedge Funds, the AGC entities, and others, contrary to Title 15, United States Code, Section 78dd-1; and

    b.  as a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and foreign political party official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official and a foreign political party official, for purposes of: (i) influencing acts and decisions of such foreign official and foreign political party official in his or her official capacity; (ii) inducing such foreign official and foreign political party official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official and foreign political party official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist OCH-ZIFF in obtaining and retaining business for and with, and directing business to itself, DRC Partner, certain companies controlled by or affiliated with DRC Partner, the Och-Ziff Hedge Funds, the AGC entities, and others, contrary to Title 15, United States Code, Section 78dd-2.

    103.  In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, within the Eastern District of New York and elsewhere, at least one of the following:

## Overt Acts

a.      On or about March 7, 2008, Och-Ziff Employee 3, an employee and agent of the defendant OCH-ZIFF and others, sent an e-mail to Och-Ziff Employee 1, a senior executive of OCH-ZIFF, which summarized the proposal to enter into business with DRC Partner.

b.      On or about April 17, 2008, an entity under the management and control of, among others, the defendant OCH-ZIFF sent a wire transfer in the amount of $15,750,000 from Barclays in Guernsey to an account in the name of DRC Partner's law firm in Gibraltar.

c.      On or about July 24, 2008, an entity under the management and control of, among others, the defendant OCH-ZIFF sent a wire transfer in the amount of $98,275,000 from Barclays in Guernsey to an account in the name of the DRC Partner's law firm with wire transfer reference of "[Company B] SJF."

d.      On or about July 28, 2008, DRC Partner caused DRC Partner's law firm to wire $257,950.00 from Barclays to an account for a co-conspirator at TD Bank in Nassau County, New York.

e.      On or about October 10, 2008, an entity under the management and control of, among others, the defendant OCH-ZIFF sent a wire transfer in the amount of $9,000,000 from an account at Northern Trust in Guernsey, through an account at Northern Trust in New Jersey and an account at Barclays in New York, to an account in the name of the DRC Partner's law firm at Barclays in Gibraltar.

f.        On or about December 9, 2008, Och-Ziff Employee 5, an agent of the defendant OCH-ZIFF and others, caused an AML employee to send an e-mail, which attached a revised audit report.

g.        On or about April 27, 2012, DRC Partner caused a company under his control to wire $5 million from its Swiss bank account at Compagnie Bancaire Helvétique SA ("CBH Bank") through correspondent accounts at Deutsche Bank Trust Company in New York and JPMorgan Chase Bank in New York, for the benefit of an OCH-ZIFF subsidiary account at Goldman Sachs in New York.

h.        On or about July 9, 2012, DRC Partner caused a company under his control to wire $10 million from its Swiss bank account at CBH Bank through correspondent accounts at Deutsche Bank Trust Company in New York and JPMorgan Chase Bank in New York, for the benefit of an OCH-ZIFF subsidiary account at Goldman Sachs in New York.

i.        On or about October 24, 2012, DRC Partner caused a company under his control to wire $40 million from its Swiss bank account at CBH Bank through correspondent accounts at Deutsche Bank Trust Company in New York and JPMorgan Chase Bank in New York, for the benefit of an OCH-ZIFF subsidiary account at Goldman Sachs in New York.

j.        On or about December 28, 2012, DRC Partner caused a company under his control to wire $127,013,807 from its Swiss bank account at CBH Bank through correspondent accounts at Deutsche Bank Trust Company in New York and JPMorgan Chase Bank in New York, for the benefit of an OCH-ZIFF subsidiary account at Goldman Sachs in New York.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Bribe Libyan Officials)

104.    The allegations contained in paragraphs one through 100 are realleged and incorporated as though fully set forth in this paragraph.

105.    On or about and between February 1, 2007 and February 25, 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, together with others, did knowingly and willfully conspire to commit offenses against the United States, to wit:

a.    as an issuer, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities in order to assist OCH-ZIFF in obtaining and retaining business for and with and directing business to itself, the Och-Ziff Hedge Funds, and others, contrary to Title 15, United States Code, Section 78dd-1; and

b.    as a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment,

promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities in order to assist OCH-ZIFF in obtaining and retaining business for and with and directing business to itself, the Och-Ziff Hedge Funds, and others, contrary to Title 15, United States Code, Section 78dd-2.

106. In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, within the Eastern District of New York and elsewhere, at least one of the following:

### Overt Acts

a. On or about March 7, 2007, Och-Ziff Employee 3, on behalf of and to benefit the defendant OCH-ZIFF, traveled from London, England to Vienna, Austria.

b. On or about December 4, 2007, Och-Ziff Employee 3 sent an e-mail, which directed Och-Ziff Employee 2 to execute the Consultancy Agreement and Side Letter with BVI-SPV-1.

c. On or about January 16, 2008, the defendant OCH-ZIFF transferred by wire $2.25 million to BVI SPV-1's account at Investec Bank (Channel Islands)

Ltd. in Guernsey via HSBC Bank USA in Newark, Delaware through JPMorgan Chase in New York.

    d.    On or about October 30, 2008, the defendant OCH-ZIFF transferred by wire $1.5 million to BVI SPV-1's account at Investec Bank in Guernsey via HSBC Bank USA in Newark, Delaware through JPMorgan Chase in New York.

    e.    On or about October 26, 2009, Och-Ziff Employee 3, on behalf and at the direction of the defendant OCH-ZIFF, traveled to Libya via John F. Kennedy International Airport in Queens, New York to visit the LIA to solicit an additional investment for the defendant OCH-ZIFF.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT THREE
(Violation of the False Books and Records Provisions of the FCPA)

107.    The allegations contained in paragraphs one through 100 are realleged and incorporated as though fully set forth in this paragraph.

108.    On or about and between November 14, 2007 and November 10, 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, together with others, knowingly and willfully falsified and caused to be falsified its books, records and accounts and did not, in reasonable detail, accurately and fairly reflect its transactions and dispositions, to wit: OCH-ZIFF knowingly falsified records related to the retention and nature of services of, and payments to, Libya Intermediary in order to conceal the true purpose of making payments to Libya Intermediary related to the Libya Real Estate Development Project and obtaining an investment from the LIA.

41

(Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a);

Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT FOUR
(Violation of the Internal Controls Provisions of the FCPA)

109.    The allegations contained in paragraphs one through 100 are realleged and incorporated as though fully set forth in this paragraph.

110.    On or about and between November 14, 2008 and December 31, 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OCH-ZIFF CAPITAL MANAGEMENT GROUP LLC, together with others, knowingly and willfully failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences, to wit: OCH-ZIFF knowingly and willfully failed to implement and maintain controls that required: (a) due diligence for the retention of third party intermediaries working on behalf of the defendant; (b) pre-clearance and approval of agreements with third-parties and agents working on behalf of the defendant by legal and compliance personnel with responsibility; (c) notification to clients and prospective clients of arrangements with third-parties having an impact act on the defendant's financial arrangements with such

clients; (d) documentation and proof that third-party services were rendered consistent with existing agreements and applicable laws; (e) drafting and entering contracts with terms fully consistent with the understandings and agreements of the parties; (f) enforcement of anti-corruption and anti-money laundering policies at all entities impacting the defendant's business operations; (g) auditing of assets and operations in areas of high-risk of corruption or misappropriation; (h) ensuring appropriate justification for the use of and payment to nominee entities; and (i) oversight of payment processes to ensure that payments were made pursuant to appropriate controls, including those described above.

(Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a); Title 18, United States Code, Sections 2 and 3551 et seq.)


ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

SANDRA L. MOSER
PRINCIPAL DEPUTY CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION-FRAUD SECTION